IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| BRUCE HARPER,<br><br>             Plaintiff,<br><br>vs.<br><br>KEVIN ROSE, et al.,<br><br>             Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 1:09-CV-153-TC |

Plaintiff Bruce Harper alleges that in the early morning hours of May 2, 2009, police officers used excessive force when he was repeatedly tased during a traffic stop and an arrest. Defendant Kevin Rose, a Deputy Sheriff for Davis County, initiated the traffic stop and was the first officer on the scene. Mr. Harper brought this suit against Deputy Rose and Davis County[1] under 42 U.S.C. § 1983, alleging violation of his civil rights under the Fourth Amendment.

Deputy Rose and Davis County filed a motion for summary judgment seeking dismissal of the civil rights claims on the basis that Deputy Rose is entitled to qualified immunity and that Davis County is not liable as a matter of law. In Mr. Harper's opposition to the motion, he conceded that Davis County is not liable under § 1983. (See Pl.'s Opp'n Mem. (ECF No. 83) at 3.) Accordingly, the court GRANTS the motion for summary judgment for Davis County. But Mr. Harper presses forward on his claims against Deputy Rose. Because the court finds that

---

[1] Mr. Harper originally brought suit against other officers and their employers as well as Deputy Rose and Davis County.

Deputy Kevin Rose is not entitled to qualified immunity, the court DENIES his motion for summary judgment.

## I. FACTUAL BACKGROUND[2]

Around 2:00 a.m. on May 2, 2009, Deputy Kevin Rose was patrolling in his squad car and had a ride-along passenger with him.  His dashboard camera was turned on, so it captured the entire traffic stop on video.  (See Ex. 5 to Pl.'s Mem. Opp'n (ECF No. 83); DVD attached to Decl. of Kevin Rose (ECF No. 75) [hereinafter "Rose Video"].)

As depicted in the Rose Video, Deputy Rose saw a car traveling in the opposite direction and noticed that the front license plate was crooked.  Plaintiff Bruce Harper was driving the car. Deputy Rose made a U-turn to follow the car, believed that he saw that the rear license plate light did not work, and signaled to the car's driver to pull over.  Having an improperly secured license plate and a broken rear license plate light are both Class C misdemeanors in Utah.

Mr. Harper slowly drove to the first side street, pulled over under a street light, and stopped his car.  Mr. Harper, who is slim and of medium height, immediately got out of the car and took three to four steps toward Deputy Rose (who was in uniform), stopping about twenty to twenty-five feet from the officer.  The area where the two were standing was relatively well lit by the street light above and the headlights from Deputy Rose's squad car.

At the same time, Deputy Rose jumped out of his car, pointed a loaded gun at Mr. Harper, and ordered Mr. Harper multiple times in quick succession to "stay in your car" and "get back in

---

[2]The facts are taken from the three video tapes recorded during the incident by responding officers' dashboard cameras (specifically, Exhibits 5, 6, and 7 attached to Plaintiff's opposition memorandum (ECF No. 83)) and, where the facts cannot be discerned from the video tapes, from the evidence presented by the parties in their briefs and supporting documentation.

your car now!" (Rose Video 9:22:19-25.) But Mr. Harper did not comply. As Deputy Rose was yelling orders, Mr. Harper had his right hand in his front pocket, and said something to the effect of "Don't pull your weapon on me." (Id. at 9:22:27-31.) Deputy Rose ordered him to remove his hand from the pocket. Mr. Harper removed his hand from his pocket and continued to ask why he had been stopped. Deputy Rose never answered Mr. Harper's questions. All this time, Deputy Rose pointed a loaded gun at Mr. Harper and continued to order Mr. Harper to turn around and put his hands on his head.

For an interminable three minutes, while Deputy Rose continued to aim his gun at Mr. Harper and repeatedly order Mr. Harper to put his hands on his head and turn around (and at one point, to get down on his knees), Mr. Harper ignored the orders. Instead of doing what Deputy Rose told him to do, Mr. Harper walked back and forth, getting progressively closer to the front bumper of the squad car, repeatedly asking throughout the incident "what's this about," "what did I do," and "what do you want?" (See Rose Video at 9:22:19-9:25:45.) Mr. Harper became more and more agitated as time progressed. He went from appearing annoyed and irritated to becoming angry and yelling and cursing at Deputy Rose. During that time, Deputy Rose repeatedly yelled "turn around, put your hands on your head." (See id.)

About thirty seconds into the encounter, Deputy Rose called for backup, telling dispatch to "expedite, one at gun point." (Rose Video at 9:22:46.) Mr. Harper was not armed, and Deputy Rose testified during his deposition that he did not believe at the time that Mr. Harper ever reached for a weapon. (Rose Dep. at 17-18.) Mr. Harper did not verbally threaten Deputy Rose, although he was passively resisting the officer's commands.

Officer Jon Purcell was next to arrive. As soon as he pulled up (his dashboard video

camera also captured the incident), he pulled out his Taser, said "Taser," pointed the Taser at Mr. Harper (one or two red lights indicated that it was aimed at Mr. Harper's chest), and counted to two. (Rose Video at 9:25:40-43; Officer Purcell Video (Ex. 6 to Pl.'s Mem. Opp'n (ECF No. 83)) at 2:33:32-33.) At this point, three officers were on the scene. As Officer Purcell aimed the Taser, Deputy Rose said "Taser" right after Officer Purcell said "Taser," and then either Deputy Rose or Officer Purcell immediately said "do it now or you are going to get tased." (Rose Video at 9:25:40-43.) Officer Purcell immediately shot the Taser at Mr. Harper.[3] The arrival of Officer Purcell, Deputy Rose's order to tase, and the tasing of Mr. Harper happened very quickly (about five seconds passed from the time Officer Purcell got out of his squad car to the time he fired the Taser).

In the moments before being tased, Mr. Harper was standing still, approximately fifteen feet from the officers. He was not told he was under arrest.

Upon being tased, Mr. Harper turned around, slightly bent over, and slowly jogged or stumbled a few feet away from the officers. Officer Purcell immediately ran up to Mr. Harper and directly placed the Taser on Mr. Harper's left buttock or lower back , delivering a "drive-

---

[3] A Taser works in two different ways. First, it can be fired from a distance. In that mode, two probes with wires connected to them are fired at the person. When the probes pierce the person's skin, the electrical shock typically incapacitates the person by causing loss of muscle control or "temporary paralysis" and pain. See, e.g., Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010). Second, it can be used by placing the taser directly on the person and shocking him. This is called a "drive-stun" and it is used to get the person to comply through intense pain. "A Taser like the M26 generates a charge of 50,000 volts, although the total amount of electricity delivered, and hence the severity of the pain inflicted, depends greatly on how long the Taser is applied." Casey v. City of Federal Heights, 509 F.3d 1278, 1285 (10th Cir. 2007).

stun."[4]  Mr. Harper yelled, "What are you doing?" (Rose Video at 9:25:50.) Officer Purcell pushed Mr. Harper towards the front of Mr. Harper's car and down to the ground. He was followed by Deputy Rose and a third officer. At that point, Mr. Harper was on the ground screaming and crying in pain as he was tased four more times. Eventually, the officers handcuffed Mr. Harper.

Officer David Suekawa arrived on the scene as the officers were struggling with Mr. Harper and Mr. Harper was being tased. Officer Suekawa's dashboard video camera provided partial footage of the event (see Suekawa Video (Ex. 7 attached to Pl.'s Mem. Opp'n (ECF No. 83)) at 2:33:07-44), but the images were low quality or taken from too far away so it was not possible to observe on the video exactly what occurred when Mr. Harper was on the ground.

Over a period of approximately fifty to sixty seconds, Mr. Harper was tased six times. Mr. Harper contends that this constituted excessive force because he was not fleeing or resisting arrest. He testified that he was involuntarily reacting to the loss of muscle control and the intense pain resulting from being tased. (See Pl.'s Opp'n Mem. at 23-24, 26-27.) But Deputy Rose and Officer Purcell claim that Mr. Harper was fleeing after he was tased the first time and that he was resisting arrest both during the time he refused to comply with the multiple orders to place his hands on his head and during the time the officers were trying to subdue him and place handcuffs on him.

## II. ANALYSIS

Deputy Rose asserts that he is entitled to qualified immunity from Mr. Harper's excessive

---

[4]See supra note 3 (explaining "drive-stun").

force claim.  For the reasons set forth below, the court finds that Deputy Rose is not entitled to qualified immunity because, although he did not actually use the Taser on Mr. Harper, a reasonable jury could find that he personally participated in the infliction of excessive force through his order to Officer Purcell to tase Mr. Harper and so predictably set in motion the subsequent events at issue.

Specifically, based on a review of the Rose Video and the Purcell Video, which together capture a significant portion of the incident, the court holds that a reasonable jury could find that during the first two critical points in the incident—i.e., the initial tasing and the first drive-stun by Officer Purcell—Deputy Rose's actions were not objectively reasonable.  As for the third critical point during the incident—that is, the melee on the ground in front of Mr. Harper's car during which Mr. Harper was tased four more times before he was finally handcuffed by the officers—no video sufficiently captures this portion of the incident and the parties present conflicting evidence of whether Mr. Harper was resisting arrest.  Accordingly, the court finds that a genuine dispute of material facts exists concerning whether Deputy Rose is liable for the use of excessive force during the melee.

**Qualified Immunity**

Qualified immunity "provides 'immunity from suit rather than a mere defense to liability.'"  Mecham v. Frazier, 500 F.3d 1200, 1203 (10th Cir. 2007) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  The doctrine shields law enforcement officers from civil liability for discretionary actions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982).[5]

Generally, summary judgment is appropriate if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Because Deputy Rose raises the defense of qualified immunity, Mr. Harper, the non-movant, bears the burden of demonstrating that the law was clearly established at the time the conduct occurred and that evidence supports a finding that Deputy Rose violated that clearly established law.  Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir. 1989); Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988).  Only after Mr. Harper has satisfied his burden does Deputy Rose "assume the normal burden of a movant for summary judgment of establishing that no material facts remain in dispute that would defeat . . . his claim of qualified immunity."  Powell, 891 F.2d at 1457.

Overall, even though the burden shifts to the non-movant, the court must view the facts in a light most favorable to the non-moving party.  See Lundstrom v. Romero, 616 F.3d 1108, 1118 (10th Cir. 2010);  Buck v. City of Albuquerque, 549 F.3d 1269, 1279 (10th Cir. 2008).  If a videotape of the incident is in the record, anything depicted in the video that contradicts and makes unbelievable the plaintiff's characterization of the incident overrides the conflicting testimony.  See Scott v. Harris, 550 U.S. 372, 380 (2007) (noting that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by [a videotape in] the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").  If, however, the video "depict[s] much

---

[5]The court may choose the order in which to analyze the "clearly established" and "constitutional violation" issues.  Pearson v. Callahan, 555 U.S. 223 (2009).

of the encounter, but [leaves] open questions about the degree of [the defendant's] resistance to arrest and the timing and extent of force levied by" the officers, a genuine issue of material fact exists.  White v. Martin, 425 Fed. Appx. 736, 743 (10th Cir. 2011); see also York v. City of Las Cruces, 523 F.3d 1205, 1210-11 (10th Cir. 2008) (holding that disputed issues of material fact existed despite existence of audio tape because recording was partly unintelligible and captured only part of the incident).

**Excessive Force Claim**

Mr. Harper contends that Deputy Rose violated Mr. Harper's right to be free from excessive force when Deputy Rose ordered that Mr. Harper be tased and, by doing so, participated in the excessive use of force against Mr. Harper.[6]  In response, Deputy Rose maintains that he is entitled to qualified immunity because he did not fire his gun[7] or use his Taser on Mr. Harper.

A citizen's excessive force claim raised in the context of an investigatory stop or arrest must be analyzed under the Fourth Amendment, which guarantees a citizen the right to be free from unreasonable seizures.  Graham v. Connor, 490 U.S. 386, 394-95 (1989) ("the 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out.") (emphasis in original).  The question of whether an officer's use of force is constitutionally excessive is whether his "actions are 'objectively reasonable' in light of the facts

---

[6]Mr. Harper also maintained in his opposition brief that Deputy Rose violated his constitutional rights because Deputy Rose did not intervene when the other officers continued to tase Mr. Harper.  But he did not plead that in his complaint, so the court does not address it.

[7]Deputy Rose speculates in his opening brief that Mr. Harper alleges excessive force in part because Deputy Rose pointed a loaded gun at him during their encounter.  But this is not the theory upon which Mr. Harper argues liability.

and circumstances confronting [him], without regard to [his] underlying intent or motivation." Id. at 397.

In its analysis, the court must carefully balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396. The court must consider the totality of the circumstances, looking at those circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. When balancing the government's interest against the nature of the intrusion, the court must analyze the government's interest by applying what are referred to as the three Graham factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the officer or others; and (3) whether the suspect is actively resisting arrest or fleeing to avoid arrest. Id. The Tenth Circuit, in a statement particularly relevant to the case here, recognized that "Graham establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." Casey v. City of Federal Heights, 509 F.3d 1278, 1285 (10th Cir. 2007).

Tasing is a seizure under the Fourth Amendment.

Before analyzing the Government's interests in tasing under the three Graham factors, the court notes that use of a Taser on an individual is a seizure under the Fourth Amendment.

> [The officer's] weapon of choice was a Taser—a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain. Although Tasers may not constitute deadly force, their use unquestionably "seizes" the victim in an abrupt and violent manner. Accordingly, the "nature and quality" of the intrusion into the interests of [the plaintiff] protected by the Fourth Amendment was quite severe.

Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010).

9

And the fact that use of a Taser may constitute excessive force was clearly established as early as Casey v. City of Federal Heights, 509 F.3d 1278 (10th Cir. 2007). See also Mecham v. Frazier, 500 F.3d 1200 (10th Cir. 2007) (noting that use of pepper spray to arrest uncooperative misdemeanant may constitute excessive force if not outweighed by governmental interests in use of that force).

"Denial of qualified immunity is appropriate if the officer violated law that was 'clearly established' at the time of his or her conduct." Cavanaugh, 625 F.3d at 666. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Weigel v. Broad, 544 F.3d 1143, 1153 (10th Cir. 2008) (quoting Cruz v. City of Laramie, 239 F.3d 1183, 1187 (10th Cir. 2001)). This does not require that the plaintiff show that the very act in question was previously held unlawful. Rather, the contours of the law "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). In other words, "an officer's violation of the Graham reasonableness test is a violation of clearly established law if there are 'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as [he] did." Casey, 509 F.3d at 1286 (quoting Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001)).

Deputy Rose's Personal Participation

Deputy Rose contends that he did not actually tase Mr. Harper so he is not, as a matter of fact and law, liable for use of excessive force. But Tenth Circuit case law clearly establishes that an officer may be personally involved in the use of excessive force even if his involvement

amounted to indirect participation.  Liability for "indirect participation" was established in April 2008 when the Tenth Circuit issued Fogarty v. Gallegos, 523 F.3d 1147 (10th Cir. 2008), and again in December 2008 when the Tenth Circuit issued Buck v. City of Albuquerque, 549 F.3d 1269 (10th Cir. 2008).  "The requisite causal connection is satisfied if the [officer] set in motion a series of events that the [officer] knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights."  Buck, 549 F.3d at 1279-80.

In Fogarty and its sister case Buck, the Tenth Circuit held that a police captain who supervised officers' response to a peaceful political demonstration was not entitled to qualified immunity when the officers' use of force was excessive under the circumstances.  In Fogarty, the Tenth Circuit noted that the Graham analysis includes consideration of "whether an officer's own 'reckless or deliberate conduct' in connection with the arrest contributed to the need to use the force employed."  523 F.3d at 1159-60 (citing Tenth Circuit cases from 2004 and 2001).  See also Henry v. Storey, 658 F.3d 1235, 1239 (10th Cir. 2011) (holding that although the Graham factors guide the analysis of an excessive force claim, they are "non-exclusive").

Here, Deputy Rose set in motion the series of events that led to the tasings.  Based on a review of the Rose Video, and taking the facts in a light most favorable to Mr. Harper, a reasonable jury could find that Deputy Rose overreacted and escalated the situation unnecessarily.  When Mr. Harper got out of his car, Deputy Rose immediately drew his weapon, keeping Mr. Harper at gun point while informing dispatch and responding officers that he had a suspect at gun point.  Deputy Rose offered no explanation to Mr. Harper for over three minutes.  A simple response to Mr. Harper's repeated questions may have diffused the situation.  But Deputy Rose did not veer from the script as he repeatedly yelled to Mr. Harper to place his hands

on his head and turn around.

Only Deputy Rose knew that Mr. Harper had been pulled over for two minor equipment violations and only Deputy Rose understood the nature of the threat when he ordered Officer Purcell to tase Mr. Harper. "The display of weapons, and the pointing of firearms at persons inescapably involves the immediate threat of deadly force. Such show of force should be predicated on at least a perceived risk of injury to the officers and others, based upon what officers knew at that time." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1192 (10th Cir. 2001). A reasonable jury could find that Deputy Rose's decision to immediately use the threat of deadly force against Mr. Harper, to call dispatch for expedited help to control an individual who was at gun point, and to order the initial tasing recklessly contributed to the other officers' reactions to Mr. Harper.

### The Three Critical Points

The encounter between Mr. Harper and the police officers had three critical points: first, the initial tasing of Mr. Harper; second, the drive-stun; and third, the fight on the ground. The court analyzes each of these three critical points separately.

    **1.    The initial tasing of Mr. Harper**

        a.    *Severity of the crime*

Traffic and equipment violations are considered minor offenses. Deputy Rose stopped Mr. Harper to investigate two minor equipment violations. Failure to secure a front license plate and driving a car that lacks a light illuminating the back license plate are Class C misdemeanors under Utah law. Utah Code Ann. §§ 41-1a-404(3), 41-1a-1302, 41-6a-1604(2)(c), 41-6a-202. Accordingly, this factor weighs against Deputy Rose. (This factor is the same for all three critical

points.)

                          b.     *Whether Mr. Harper posed an immediate threat to the officers or others*

Under this Graham factor, the threat must be immediate, not potential.  Graham, 490 U.S. at 396.

Deputy Rose emphasizes that Mr. Harper immediately stepped out of his car upon being stopped and did not comply with Deputy Rose's continued orders to place his hands on his head and turn around for more than three minutes despite being held at gun point.  Mr. Harper also periodically yelled and swore at Deputy Rose.  He sometimes advanced toward Deputy Rose, but always kept his distance, and then alternated movement by backing away in a confused manner.  He never verbally threatened Deputy Rose or anyone else.  When ordered to remove his hand from his right pocket, Mr. Harper complied and did not reach for the pocket again.  Mr. Harper did not have a weapon, much less brandish a weapon or make sudden movements that would lead an officer to believe use of a weapon was imminent.

The record strongly suggests that Mr. Harper may have been a potential threat (as his anger and frustration visibly and audibly grew) but that he was not an immediate threat.  He was held at bay for more than three minutes.  When Officer Purcell arrived, any existing threat decreased and the officers' options for taking Mr. Harper into custody increased.  See, e.g., Beaver v. City of Federal Way, 507 F. Supp. 2d 1137, 1145 (W.D. Wash. 2007) (noting that excessive force analysis changed when additional officer arrived so that "there were two officers to control the situation.  To the extent that [the plaintiff] posed an 'immediate threat', that threat was significantly diminished when [the second officer] arrived to provide backup.  Once [the

officer] had backup, his options increased dramatically.").

Deputy Rose contends that use of other options would have put him and Officer Purcell at greater risk. Such a contention was rejected in Beaver where the plaintiff was tased and claimed excessive force.

> Defendants essentially ask the Court to accept the proposition that the police should be permitted to use means such as a Taser to shield themselves from any possibility of harm and the suspect must suffer the consequences. To accept this proposition would effectively eviscerate the protections of the Fourth Amendment and also ignore the teachings of Graham, which counsels that a key question in this inquiry is whether a suspect poses an "immediate" threat, not a "possible" threat.

507 F. Supp. 2d at 1146.

The court agrees that, under the circumstances presented in the record, the argument that Mr. Harper posed an unacceptable risk even upon the arrival of Officer Purcell cannot prevail at this juncture. Mr. Harper, who was physically smaller than both Deputy Rose and Officer Purcell, did not verbally threaten Deputy Rose or attempt to physically attack Deputy Rose. Other than the brief moment when he placed his right hand in his pocket early in the encounter, he did not make any gestures suggesting he was armed with a weapon. Indeed, when asked to remove his hand from his pocket, Mr. Harper immediately complied and never again placed his hands in his pocket before being tased. Although Mr. Harper ambled about, he always kept his distance from Deputy Rose. And when Deputy Rose ordered that Mr. Harper be tased, Mr. Harper was standing still.

For the foregoing reasons, the court finds that Deputy Rose has not met his burden of showing that no genuine dispute of material fact exists concerning whether Mr. Harper posed an immediate threat to Deputy Rose or Officer Purcell when he was initially tased.

      c.  *Whether Mr. Harper was actively resisting arrest or fleeing*

During the time Mr. Harper was bickering with Deputy Rose, he was obstinate but passive in his non-compliance with Deputy Rose's orders.  See Beaver, 507 F. Supp. 2d at 1145-46 (finding that "voluntary non-compliance" did not rise to the level of "active resistance").  Although Mr. Harper behaved in an extremely stubborn, risky, and ill-advised manner, he never left the scene or made any effort to flee.  Indeed, when Officer Purcell arrived, Mr. Harper was standing still.

Deputy Rose did not tell Mr. Harper that he was under arrest or explain why he stopped Mr. Harper.  And within seconds of Officer Purcell's arrival, Deputy Rose ordered Officer Purcell to tase Mr. Harper while he or Officer Purcell rapidly warned Mr. Harper to comply or he would be tased.  Mr. Harper was not given a chance to respond to the new threat of being tased.

In Casey, the Tenth Circuit found that the force inflicted "all without warning or explanation" on a non-violent misdemeanor defendant was not objectively reasonable.  509 F.3d at 1285.

> Cases in our Circuit and others that have considered the reasonable use of Tasers confirm this conclusion.  In Hinton v. City of Elwood, 997 F.2d 774, 777 (10th Cir. 1993), we held that it was not excessive force to use an "electrical stun gun" on a man after grabbing him and wrestling him to the ground.  But we noted that what justified this conduct was his active resistance to arrest – Mr. Hinton was kicking and biting at the officers and had shoved one of them to start the fight.  Id. at 776-777, 781.  Moreover, the officers had warned Mr. Hinton, before he shoved one of them, that they would arrest him for disorderly conduct "if he engaged in one more outburst."  Id. at 776.  Neither of these factors – the warning or the violence of the victim – is present here to justify the use of the Taser.

Casey, 509 F.3d at 1286.

Given the lack of a viable warning of arrest or tasing, along with Mr. Harper's passive

stance right before being tased, a reasonable jury could conclude that Mr. Harper was not actively resisting arrest or fleeing at that point in the encounter.

Based on the above analysis, the court concludes that Officer Rose is not entitled to qualified immunity for his actions at this critical point.

### 2. The drive-stun

#### a. *Severity of the crime*

As noted above, this factor weighs in favor of the Plaintiff.

#### b. *Whether Mr. Harper posed an immediate threat to the officers or others*

When Mr. Harper was tased the first time, he was partially incapacitated as indicated by his reaction to the tasing. As soon as he was hit, he turned around, slightly bent over with his hands to his chest, and slowly jogged in a staggering manner a few steps before Officer Purcell ran up to Mr. Harper and drive-stunned Mr. Harper in the left buttock or lower back. The momentum of Officer Purcell's drive-stun pushed Mr. Harper forward and down to the ground, and two officers followed.

When Mr. Harper was tased the second time, he was unarmed and was suffering the effects of the first tasing. His back was to Officer Purcell. He was not moving quickly, much less lashing out with his arms or fists. He was surrounded by three police officers. A reasonable jury could find that he did not pose an immediate threat to anyone.

#### c. *Whether Mr. Harper was actively resisting arrest or fleeing*

Officer Rose contends that Mr. Harper was attempting to flee before Officer Purcell tased him a second time. But the videos suggest otherwise. After Mr. Harper was shot with the Taser

the first time, he slowly staggered away from the officers. As depicted in the video, although Mr. Harper was not completely incapacitated by the initial tasing, he was partially incapacitated and in pain. A reasonable jury could conclude that Mr. Harper's slow staggering jog did not amount to actively resisting arrest or fleeing. "Involuntary actions cannot form the basis of active resistance." Beaver, 507 F. Supp. 2d at 1146.

Officer Rose is not entitled to qualified immunity for his actions during the second critical point.

### 3. The Fight on the Ground

The accounts of what happened after the first drive-stun are conflicting. Mr. Harper contends that the flailing of his arms was an involuntary and defensive reaction to the pain of the Taser. The officers contend that Mr. Harper physically resisted being subdued and handcuffed. The videotape does not clearly show what occurred at this point in the encounter between the officers and Mr. Harper. Because of the disputed facts, the court cannot determine whether Mr. Harper was either a danger to the officers or actively resisting arrest during the time he was tased while on the ground. See Beaver, 507 F. Supp. 2d at 1145 (finding that disputed facts prevented grant of qualified immunity because repeated tasing raised a material issue of fact regarding whether the suspect was actively resisting the officers or reacting to the intense pain of the Taser). This aspect of the encounter must go to the jury for resolution.

## III. CONCLUSION

Because Deputy Rose has not met his burden of showing that no genuine dispute of material fact exists to contradict his claim that his actions were objectively reasonable, he is not entitled to qualified immunity. The record suggests that the first and second tasings amounted to

excessive force in violation of Mr. Harper's Fourth Amendment rights and that Deputy Rose participated in the use of that excessive force by setting in motion the events that led to Officer Purcell's initial tasing and subsequent drive-stun of Mr. Harper.  That is, a reasonable jury could find that Deputy Rose participated by unnecessarily escalating the situation and then giving the order to tase Mr. Harper, a misdemeanor defendant who was not an immediate threat and who was not actively resisting arrest or trying to flee either at the time he was tased initially or when he was tased a second time.

Likewise, Deputy Rose is not entitled to qualified immunity from liability for the remaining four tasings because a genuine dispute of material facts exists concerning whether Mr. Harper was actively resisting arrest at that point in the encounter.

## ORDER

For the foregoing reasons, it is hereby ORDERED that the Motion for Summary Judgment (ECF No. 74) is DENIED AS TO DEPUTY KEVIN ROSE, but because Mr. Harper has conceded that Davis County is not liable, the Motion is GRANTED AS TO DAVIS COUNTY.

SO ORDERED this 5th day of April, 2012.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
U.S. District Court Judge